GILMORE & P. R. CO. v. UNITED STATES FIDELITY & GUARANTY CO.

(Circuit Court of Appeals, Third Circuit.    October 29, 1913.)

No. 1,745.

1. PRINCIPAL AND SURETY (§ 59*)—SURETY CONTRACT—CONSTRUCTION.

While a modern surety company is not entitled to receive the same degree of protection that courts of equity extend to individual sureties, a surety company is nevertheless entitled to have its contract interpreted according to the ordinary rules of law.

[Ed. Note.—For other cases, see Principal and Surety, Cent. Dig. §§ 103, 103½; Dec. Dig. § 59.*]

2. PRINCIPAL AND SURETY (§ 78*)—FUNDS SECURED—"DEPOSIT"—PURCHASE OF EXCHANGE—SURETY BOND.

Where a railroad company's agent took cash, individual checks, etc., to a bank in which his company maintained an inactive deposit account and obtained therefor a cashier's check to the order of the railroad company which he sent to its head office to be deposited and thereafter collected through another bank, such transaction constituted a purchase of exchange and not a deposit of the railroad company's funds within a bond securing deposits.

[Ed. Note.—For other cases, see Principal and Surety, Cent. Dig. § 124; Dec. Dig. § 78.*

For other definitions, see Words and Phrases, vol. 2, pp. 1995–1999; vol. 8, p. 7634.]

In Error to the District Court of the United States for the Western District of Pennsylvania; Charles P. Orr, Judge.

Action by the Gilmore & Pittsburgh Railroad Company against the United States Fidelity & Guaranty Company. Judgment for plaintiff for less than the relief demanded, and it brings error. Affirmed.

A. O. Fording, of Pittsburgh, Pa., for plaintiff in error.

Charles F. Patterson, Frank W. Stonecipher, and John M. Ralston, all of Pittsburgh, Pa., for defendant in error.

Before GRAY, BUFFINGTON, and McPHERSON, Circuit Judges.

J. B. McPHERSON, Circuit Judge. This case was submitted to Judge Orr without a jury upon an agreed statement of facts, which may be summarized as follows:

The railroad company owns and operates a line in the states of Montana and Idaho. The eastern terminus is at Armstead, a small village in Montana, where connection is made with the Oregon Short Line, and one of its western termini is at Salmon, a town in Idaho. During the period in question a single train ran each day (Sundays

excepted) between these points, moving east on one day and west on the next. The railroad maintained its operating department at Armstead, but (as Armstead had no bank) most of the department's banking business, including its active account, was kept at the First National Bank of Dillon, a town on the Oregon Short Line about 30 miles distant. There were two mails a day between Armstead and Dillon, and one mail on alternate days between Armstead and Salmon.

The railroad company had carried an ordinary deposit account with the Salmon Bank since April 2, 1910. It was not a very active account, for it only comprised a deposit of $10,000 on April 2d and seven checks drawn against this credit in August and September by which the credit was reduced to $125.99. In March, 1911, the bank asked the railroad company to deposit a part of its current funds, and on March 29th the bank was designated as a depository of such funds. Accordingly on April 19, 1911, a further sum of $10,000 was placed to the railroad's credit. On May 3d the bank, as principal, and the United States Fidelity & Guaranty Company, as surety, executed a bond to the railroad company, as obligee, in the penal sum of $10,000, reciting that the railroad company had designated the bank "as depository of the funds of the Gilmore & Pittsburgh Railroad Company Limited," and providing that the bank should "faithfully account for and in due and ordinary course of business pay over on legal demand all moneys deposited with said (bank) by or on behalf of the said (railroad company)." No other checks were drawn against this ledger account, so that the sum of $10,125.99 was due thereon to the railroad company on June 8, 1911, the day when the bank closed its doors. As security for this deposit the railroad had another bond of $10,000 in another company; this additional bond diminishing the Fidelity and Guaranty Company's obligation by one-half. The Fidelity Company admitted liability for one-half the sum just named, and the District Court entered judgment for this amount; but the railroad company alleged that a further sum of $3,280.34 was covered by the terms of the bond, and for this amount the Fidelity Company denied liability and in this contention was sustained by the court. The remaining facts that relate to the dispute are as follows:

Beginning with April 24, 1911, the railroad company's station agent at Salmon had regularly used the following method of transmitting his collections: At frequent intervals he would take to the Salmon Bank such cash and individual checks (duly indorsed) as were in his hands and would obtain therefor a cashier's check to the order of the railroad company. This check would be sent at once to the company at Armstead; the company would mail it to Dillon and deposit it there; and the Dillon Bank would thereupon mail it to the Salmon Bank for presentation and collection. The agent at Salmon did not deposit the cash and the checks to the credit of the railroad company's ledger account there; and the cashier's checks were not so deposited. No checks were drawn against that account either by him or by any one else. The method just referred to of obtaining and collecting cashier's checks was followed on 19 occasions during April and May,

1911, and all these checks were duly presented to the Salmon Bank and were paid. But on May 31st and on June 2d two additional cashier's checks for $2,428.14 and $752.20, respectively, were obtained by the agent in the usual manner, and payment of both these checks was refused upon presentation. Thereupon the checks were charged back to the railroad's account in the Dillon Bank.

[1, 2] It is the nature of these checks that is now in dispute, and the question is: Does the bond cover such a transaction as has just been described? Or, to state it in other words, were the cashier's checks "moneys deposited with said (bank) by or on behalf of the said (railroad company)?" In an opinion not yet reported, the learned judge answered this question in the negative, and we think he was right. We agree that the modern surety company should not receive the same degree of protection that courts of equity have always extended to an individual surety. Atlantic, etc., Co. v. Laurinburg (C. C. A.) 163 Fed. 690, 90 C. C. A. 274; U. S. Fidelity Co. v. U. S. (C. C. A.) 178 Fed. 692, 102 C. C. A. 192. But a surety company is nevertheless entitled to have its contract interpreted by the ordinary rules of law, and we think these rules require us to hold that the bond in suit does not cover such a transaction as the purchase of the cashier's checks now in controversy. Under the facts agreed upon, the deposits covered by the bond were "deposits" in the ordinary meaning of that word—moneys credited to a ledger account and subject to the depositor's check. In effect these cashier's checks were bills of exchange drawn by the bank's officer on the bank itself and accepted by the very act of drawing. Drinkall v. Movius Bank, 11 N. D. 10, 88 N. W. 724, 57 L. R. A. 341, 95 Am. St. Rep. 693; Valdetero v. Bank, 51 La. Ann. 1651, 26 South. 425. The agent was not attempting to make a "deposit" in the usual meaning of the word to the credit of the railroad company; the contract into which he was entering was a contract between a buyer and a seller of exchange rather than a contract between a bank and a depositor having an account on the ledger. If the agent had been making a deposit in the ordinary course, the funds in his hands would have gone into the ledger account and could only have been drawn out by a check thereon, which the agent did not draw and (so far as appears) had no authority to draw. In spite of the very capable argument for the railroad company, it seems clear to us that the transactions between the agent and the bank were not covered by the bond. He made no "deposit" under the facts now presented, and apparently he had no authority to "deposit." For convenience, or perhaps for safety, he transmuted the cash and the individual checks in his hands into a domestic bill of exchange and forwarded the bill to his principal in settlement of his collections. The question is a narrow one, and we think it does not need further discussion.

The judgment is affirmed.